HARRIS WOLF

*v.*

THE NATIONAL BANK OF ILLINOIS *et al.*

*Opinion filed February 17, 1899.*

1. STIPULATIONS—*when stipulation is broad enough to admit defense of illegality.* A stipulation of facts in an action against a corporation for breach of contract, which provides that the "power" of the corporation to make the contract is affirmed by the plaintiff and denied by the defendant, is broad enough to admit the defense that the contract is illegal, as against the statute prohibiting the making of option contracts.

2. CONTRACTS—*when a contract to re-purchase bonds is not an option.* A contract by which a bank, on selling staple bonds, agrees to re-purchase them at a specified time in the future at their selling price, with interest from the date of the sale, is a contract of conditional sale and not an option contract, where both parties acted in good faith, the purchaser having refused to take the bonds unless the bank would agree to take them back, which both parties believed it had authority to do.

3. RECEIVERS—*receiver cannot disregard insolvent's fixed obligations.* A contract of conditional sale, entered into in good faith by both parties, by which the seller (a bank) has become liable to re-purchase staple bonds at a fixed time in the future, is binding upon the receiver of the bank.

4. JUDGMENTS AND DECREES—*judgment against insolvent national bank—when in proper form.* In an action against an insolvent national bank and its receiver for damages for breach of contract, the court may enter judgment against the bank alone and direct the receiver to certify the claim in judgment to the comptroller of the currency of the United States, to be paid by him in due course of administration of the assets of the bank.

*McKeon* v. *Wolf*, 77 Ill. App. 325, reversed.

APPEAL from the Appellate Court for the First District;—heard in that court on writ of error to the Circuit Court of Cook county; the Hon. E. F. DUNNE, Judge, presiding.

The National Bank of Illinois, at Chicago, sold to Harris Wolf certain bonds known as bonds of the Chicago Auditorium Association, and at the time of the several

sales entered into the following agreements and undertakings with appellant:

"*H. Wolf, Esq., City:*                    "CHICAGO, *June 22, 1896.*

"DEAR SIR—We have this day sold to you $11,000 of the five per cent bonds of the Chicago Auditorium Association, at par, and interest. Should you desire to re-sell to us during the month of January, 1897, we will buy them back from you at same price.

"Yours truly,     WM. A. HAMMOND, *Second Vice-Pres't.*"

On July 9, 1896, in connection with the sale of others of the bonds:

"Should you wish to sell these bonds back to us in the month of January, 1897, we will buy them back at par, and interest.

W. A. HAMMOND, *Second Vice-Pres't.*"

On July 14, 1896, referring to the sale of others of the bonds:

"Should you wish to sell us these bonds back during the month of January, 1897, we will re-purchase them at par, and interest.         W. A. HAMMOND."

And on July 15, 1896, referring to another of the sales:

"If you wish to sell these bonds back to us at par, and interest, during the month of January, 1897, we will re-purchase them from you at the above price.

W. A. HAMMOND, *Second Vice-Pres't.*"

The bank failed on the 21st day of December, 1896, and on that day John C. McKeon was appointed receiver. On January 16, 1897, appellant gave the following notice to the receiver:

"CHICAGO, ILL., *Jan. 16, 1897.*

"*Hon. John C. McKeon, Receiver Nat. Bank of Illinois:*

"DEAR SIR—I hereby tender you thirty-five bonds of the Chicago Auditorium Association, of $1000 each, making a total of $35,000, and I hereby offer to sell said bonds to you, as said receiver, at their face value, with accrued interest. This tender and this offer to sell are made in pursuance of certain receipts and guarantees given me by said National Bank of Illinois at the time I purchased said bonds from said bank. Copies of said receipts and said guarantees are attached hereto and made a part hereof, and your attention is specifically called thereto.

"You are further notified that if said bonds are not re-purchased by you in pursuance of above demand I shall at once

place them upon the open market, offering them for sale, and shall hold said bank, and you as receiver thereof, liable for any loss incurred by me growing out of said sale, or I shall have said bonds appraised and their present market value fixed, and hold you, as receiver of said bank, and said bank, liable for any difference between the face value and said appraised value.

H. WOLF."

The receiver refused to accept the bonds or to recognize any obligation by reason of the agreements to repurchase. This suit was brought to recover damages for breach of these several agreements by the bank to repurchase the bonds at the option of the appellant. A jury was waived and the cause submitted to the trial court upon an agreed statement of facts. Among other items in the agreed statement is the following:

"8. That in all of said purchases said plaintiff informed the said bank, acting through said W. A. Hammond, its second vice-president, that he would not make said purchases unless said bank would contract in writing to repurchase said bonds, as is in said several contracts more fully stated."

It was further stipulated that all of said transactions were made between said parties in good faith, and that said plaintiff fully believed that said bank, acting through said Hammond, had full power and authority to enter into such contracts, and that said W. A. Hammond, acting as such second vice-president of said bank, fully believed that said bank had the power and authority to enter into such contracts; that said W. A. Hammond, in his capacity as second vice-president of said bank, exercised all the powers vested in the president and first vice-president of said bank as a matter of fact, but in the making of said contracts the board of directors did not pass any resolution authorizing the execution and delivery of said contracts; that all of the said contracts recited herein shall be considered by the court as if they had been signed, "The National Bank of Illinois, by W. A. Hammond, its second vice-president;" that said bank had

an authorized capital of one million dollars, and always did a very large commercial banking business; that said Auditorium bonds were not speculative bonds, but were and are, in the banking community of Chicago, recognized as good and valid staple securities, either for a loan of money or for the purchase and sale thereof; that such bonds mentioned in said contracts formed a part of a purchase of $50,000 by said bank, the remainder of which were in the possession of the bank as a part of its assets at the time when the receiver took possession thereof under the orders of the comptroller of the currency. Item 14 of the stipulation was as follows:

"14. It is agreed that in the making of this stipulation by the parties hereto, the power of the National Bank of Illinois, and that of William A. Hammond, its second vice-president, to enter into said contracts in its behalf is affirmed on the part of the plaintiff herein and is disputed on the part of the defendants herein, and the judgment of the court is requested on the stipulated facts."

The circuit court found the issues in favor of the plaintiff and entered judgment against the National Bank of Illinois for the sum of $35,257.61, but refused to enter judgment against the receiver, but entered an order "that John C. McKeon, receiver, certify this claim in judgment to the comptroller of the currency of the United States of America, to be paid by him in the due course of administration of the assets of said National Bank of Illinois at Chicago." To reverse the judgment the defendants sued out a writ of error to the Appellate Court, where the judgment was reversed and the plaintiff appealed to this court. McKeon, the former receiver of the bank, has since been succeeded in the receivership by John McNulta, one of the appellees.

MOSES, ROSENTHAL & KENNEDY, for appellant:

The case as made by the stipulation does not involve the question of the criminal statute concerning gambling

contracts.    Parties are bound by their stipulations and cannot raise questions outside of them.

The contracts in question are not option contracts in the sense of the statute, even if bonds of incorporated companies could be included in the statute.  ·Richter v. Frank, 41 Fed. Rep. 859;  Gaines v. Williams, 146 Ill. 450.

Where the intention of the legislature is in question, it is the duty of courts to adhere to the words of the statute, construing them according to their nature and import in the order in which they stand in the act, rather than to enter upon an inquiry as to the supposed intention of the law-making body. Martin v. Swift, 120 Ill. 488; Frye v. Railroad Co. 73 id. 399; Beardstown v. Virginia, 76 id. 34.

When there are general words following particular words in a statute, the former must be confined to things of the same kind as those specified. Hence, when a specific enumeration concludes with a general term, it is held to be limited to things of the same kind and is restricted to the same genus as the things enumerated. Sutherland on Const. of Statutes, sec. 270; Shirk v. People, 121 Ill. 61; Brush v. Lemma, 77 id. 496; In re Swigert, 119 id. 83; Marquis v. Chicago, 27 Ill. App. 252; Wilson v. Sanitary District, 133 Ill. 443; Cairo v. Coleman, 53 Ill. App. 680; Citizens' Bank v. Steamboat Co. 2 Story, 16; Ambler v. Whipple, 139 Ill. 311; Moore v. People, 146 id. 600; Gillock v. People, 171 id. 307; Hankins v. People, 106 id. 628.

Bonds cannot be included in the general term "or other commodity." Such term must have reference to like specific articles having bulk, weight or character, and not merely evidences of value, such as notes, bills of exchange, checks, policies of insurance, bills of lading or bonds of incorporated companies. Insurance Co. v. State, 24 S. W. Rep. 397; State v. McGarry, 21 Wis. 502; Misch v. Russell, 136 Ill. 22.

Even where the first term is generic in its sense, the general words following it will be restricted to like classes

of things, even if superior in character. *Misch* v. *Russell,* 136 Ill. 22.

Courts will not include matters into a statute simply because, in good reason, they ought to have been included, nor can courts supply omissions in legislation. Sutherland on Stat. Const. sec. 235; *Springside Coal Co.* v. *Grogan,* 53 Ill. App. 66; *Carberry* v. *People,* 39 id. 506.

The contracts in evidence are ordinary contracts of sale and re-purchase, and the receiver stands in the shoes of the principal. *Suppiger* v. *Gruaz,* 137 Ill. 216; *Smith* v. *Goodman,* 149 id. 75; *Parker* v. *Hull,* 46 Ill. App. 471.

While receivers may reject leases they cannot reject executory contracts of their debtor. *Railway Co.* v. *Humphreys,* 145 U. S. 82.

Although a national bank may do an act *ultra vires,* its validity cannot be questioned by any one other than the United States. *Thompson* v. *Bank,* 146 U. S. 240; *Bank* v. *Matthews,* 98 id. 621.

National banks may sell bonds and agree to re-purchase them. *Bank* v. *Townsend,* 139 U. S. 67; *Bank* v. *Whitney,* 103 id. 99; *Bank* v. *Matthews,* 98 id. 621.

GEORGE M. ECKELS, for appellees:

Parties to a contract void as against public policy cannot, by agreement among themselves, compel a court to adjudicate upon their rights. If the appellees had in express terms stipulated not to raise the question of gambling contract, yet if this record disclosed a gambling contract the court could, of its own motion, dismiss the proceeding, and the action of the court could not be assigned as error. *Wright* v. *Cudahy,* 168 Ill. 86.

All contracts for options for the sale of commodities are void. Starr & Curtis' Stat. (2d ed.) Crim. Code, sec. 130; *Schneider* v. *Turner,* 130 Ill. 28; 27 Ill. App. 220; *Locke* v. *Fowler,* 41 id. 66; *Corcoran* v. *Coal Co.* 37 id. 577; 138 Ill. 398; *Kerton* v. *Hilton,* 51 Ill. App. 437; *Campion* v. *Smith,* 46 id. 501; *Peterson* v. *Currier,* 62 id. 163; 163 Ill. 528; *Wolsey*

v. *Neeley*, 62 Ill. App. 141; *Barnett* v. *Powell*, Litt. Sel. Cas. 410; *State* v. *Williams*, 2 Strob. 474; Const. art. 13; Crim. Code, sec. 88; Railroad and Warehouse act, sec. 177; *Ellis* v. *Murray*, 28 Miss. 142; Sutherland on Stat. Const. secs. 278, 279; Am. & Eng. Ency. of Law, 23, 443; *United States* v. *Fisher*, 6 U. S. 358; *Foster* v. *Blount*, 18 Ala. 687; *State* v. *Holman*, 3 McCord, 306; *Woodworth* v. *State*, 26 Ohio St. 196; *Webber* v. *Chicago*, 148 Ill. 319; *Eubanks* v. *State*, 5 Mo. 450; *Stropshier* v. *Glasscock*, 4 id. 536.

The word "commodity" has two significations. In its most comprehensive sense it means convenience; accommodation; profit; benefit; advantage; interest; commodiousness. The word is ordinarily employed in the commercial sense of any movable or tangible thing that is produced or used as the subject of barter or sale. Am. & Eng. Ency. of Law, (2d ed.) "Commodity."

If the particular words exhaust a whole *genus* the general words must be held to refer to some larger *genus*. Sutherland on Stat. Const. sec. 278.

When all those of an inferior degree are embraced by the express words used, and there are still general words used, they must be applied to things of a higher degree than those enumerated, otherwise there would be nothing for the general words to operate upon and effect could not be given to all of the words. *Ellis* v. *Murray*, 28 Miss. 142.

Mr. Justice CRAIG delivered the opinion of the court:

It is insisted in the argument, on behalf of appellees, that the agreements upon which a recovery was had in the circuit court falls within section 130 of chapter 38 of the Revised Statutes, and is void. On the other hand, it is first claimed by appellant that under the stipulation of facts upon which the cause was tried the criminal statute is not involved and appellees cannot rely upon that statute as a defense. As has been seen, item 14 of the stipulation provides that "the power of the National Bank of Illinois, and that of William A. Hammond, its second

vice-president, to enter into said contracts in its behalf is affirmed on the part of the plaintiff herein and is disputed on the part of the defendants." Under this part of the stipulation the defendants had the undoubted right to rely upon any ground which would disclose a want of power on the part of the bank to enter into the contracts, and if the statute rendered the contracts void as gambling contracts, we perceive no reason why the bank might not rely on the statute as well as any other matter which might disclose a want of power.

It is next contended that the contracts in question are not gambling contracts and do not fall within section 130 of the Criminal Code,—and this is the principal question presented by the record. The section of the statute in question is as follows: "Whoever contracts to have or give to himself or another the option to sell or buy at a future time any grain or other commodity, stock of any railroad or other company, or gold, or forestalls the market by spreading false rumors to influence the price of commodities therein, or corners the market, or attempts to do so, in relation to any of such commodities, shall be fined not less than $10 nor more than $1000, or confined in the county jail not exceeding one year, or both; and all contracts made in violation of this section shall be considered gambling contracts, and shall be void."

It appears from the record that the National Bank of Illinois, at the time the contracts were made, had an authorized capital of one million of dollars and did a large commercial banking business. It also appears that the Auditorium bonds were not speculative bonds, but were in the banking community of Chicago recognized as good and valid staple securities, either for the loan of money or for the purchase and sale thereof; that the bonds mentioned in the contracts formed a part of a purchase of $50,000 by the bank, $15,000 of which remained in the possession of the bank as a part of its assets at the time the bank went into the hands of the receiver. It also

appears that the contracts were made in good faith, and both plaintiff and W. A. Hammond, second vice-president of the bank, fully believed the bank was clothed with power and authority to make the contracts. It further appears plaintiff refused to purchase the bonds unless the bank would contract, in writing, to take them back at par, and interest, in case he desired to return them.

These are the facts surrounding the transaction at the time the contracts in question were entered into between the bank and the plaintiff, and it is manifest that there was no intention on the part of the bank or the plaintiff, in making the contracts, to violate the criminal law of the State or to enter into a contract prohibited by law. Are the contracts in question, when properly construed, option contracts or gambling contracts, within the meaning of the statute?

It may be conceded that the contracts in question purport to be a sale of $35,000 of five per cent bonds of the Chicago Auditorium Association at par and accumulated interest from the bank to the plaintiff, with an option to re-sell during the month of January, 1897, at the price paid, with interest; but when the different parts of the contract are construed as a whole, the sale of the bonds may be regarded as a conditional sale, with the right reserved by plaintiff to return them during the month of January, 1897. Under the contracts the amount to be paid by the bank to the plaintiff in case he desired to return the bonds was the face value and interest on the amount which the plaintiff had paid, and interest from the time of payment. The obvious intention of the parties was to make a conditional sale, and the condition upon which the purchase was made was, that the bank should take the bonds back at the same price if within a specified time the plaintiff desired to return them. In other words, the bonds were turned over by the bank to the plaintiff at a certain stipulated price with the distinct agreement that the plaintiff had the right, during the month of January, 1897, to

elect whether he would keep them or return them to the bank, and in case he concluded to return the bonds he was entitled to receive his money back, with interest. The transaction was one both reasonable and proper, and one not within or prohibited by the statute. Indeed, it contains no element of a gambling contract. There was here no contract to have or give, to himself or another, the option to sell or buy at a future time, within the meaning of the statute, but, on the other hand, the appellant, as a part of his contract under which the bonds were delivered to him, reserved the right, at and within a specified time, to return the bonds and receive back the money he had paid, and interest thereon. It is difficult to see how a contract of that character can be termed a gambling contract or one that should be prohibited by law. Is it contrary to law or justice, or does it violate any rule of public policy, for a person to sell a horse, a cow, a promissory note or a bond for a specified sum and agree to take the article back within a given time for the same price? If it is, this contract might be condemned; otherwise not. A contract similar to the one involved here came before the court in *Richter* v. *Frank*, 41 Fed. Rep. 859, and the contract was held not to be within the statute.

*Schneider* v. *Turner*, 130 Ill. 28, has been cited and relied upon by appellees as an authority that the contracts in question are within the statute, and void. The contract in that case, which was a mere option contract, was held to be within section 130 of the Criminal Code, but upon examination it will be found that the contract there involved was so different from the contracts in this case that the decision there cannot control here. In the case under consideration the plaintiff notified the bank, before he agreed to take the bonds, that he would not take them unless the bank would agree to take them back, and the bank agreed, as a condition upon which plaintiff parted with his money and received the bonds, that it would take them back in the following January at the same price,

and we see no reason why the bank should not abide by its contract.

It is, however, said in the argument that the memoranda were mere offers, made without consideration, whereby the bank offered to buy during the month of January, 1897, in which case, the bank having been placed in the hands of a receiver and the receiver having repudiated the offers upon his appointment and prior to acceptance, the offer was of no binding force or effect. The agreement entered into between the appellant, Wolf, and the bank, was, at the time the receiver was appointed, a valid subsisting contract, which fixed the obligations and determined the rights of the respective parties, and the receiver was clothed with no power to do any act which might impair the obligation of that contract. *Chemical Nat. Bank* v. *Hartford Deposit Co.* 156 Ill. 522; same case, 161 U. S. 1.

As has been seen, the circuit court rendered judgment against the bank but declined to enter a formal judgment against the receiver. The court, however, entered an order requiring the receiver to certify the claim in judgment to the comptroller of currency of the United States, "to be paid by him in due course of administration of the assets of the said National Bank of Illinois." This action of the court has been called in question by appellant by cross-errors assigned in the Appellate Court. The rule adopted by the circuit court is sustained by *Merrill* v. *First Nat. Bank*, 75 Fed. Rep. 148.

We are inclined to the opinion, under all the facts of the case, no such error was committed in the rendition of the judgment as should call for its reversal. The judgment of the Appellate Court will be reversed and the judgment of the circuit court will be affirmed.

*Judgment reversed.*